NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0770n.06
Filed: October 17, 2006

No. 05-4528

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT CAMPBELL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THE UNIVERSITY OF AKRON, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: ROGERS and GRIFFIN, Circuit Judges; and OBERDORFER, District Judge.**[*]

**ROGERS, Circuit Judge.** Plaintiff-Appellant Robert Campbell appeals the district court's

order granting summary judgment to Defendant-Appellee The University of Akron. Campbell, an

employee of the University, brought claims of racial discrimination, retaliation, and racial

harassment against the University for disciplinary actions it took against him since the settlement of

his prior discrimination, retaliation, and harassment lawsuit against the University, and for the

University's repeated failure to promote him. The district court held that Campbell could not

establish a prima facie case of racial discrimination or retaliation with respect to each of the

disciplinary actions the University took against him, and with respect to all but one of the promotions

he was denied. The district court held, in the alternative, that even if Campbell could establish a

---

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of
Columbia, sitting by designation.

prima facie case with respect to these adverse employment actions, the University had presented legitimate, non-discriminatory reasons for its actions that were not rebutted by Campbell as pretext. The district court held that Campbell did establish a prima facie case with respect to one promotion he was denied where the University had not yet filled the position, but held that Campbell could not rebut the University's legitimate, non-discriminatory reason as pretext. Finally, the district court held that Campbell did not establish a prima facie case of racial harassment.

The district court properly granted summary judgment in favor of the University except with respect to claims based on three instances of minor discipline. Although Campbell cannot establish a prima facie case of discrimination or harassment with respect to several of the disciplinary actions the University took against him, as well as the University's failure to promote him, he can establish a prima facie case with respect to three disciplinary actions the University took against him—a verbal warning for violating a safety-lock policy, and an oral warning and a written warning for violating a lunch-break policy. The University concedes that these actions were adverse employment actions under Title VII. The University presents sufficient legitimate, non-discriminatory reasons for each warning, but Campbell presents enough evidence to rebut the University's reasons as pretext. We uphold the remaining determinations of the district court.

**Background**

Robert Campbell has worked at the University as a Certified Master Heating Ventilation and Air Conditioning ("HVAC") Technician in the University's Physical Facilities Operation Center

("PFOC") since 2002. Prior to 2002, Campbell worked at the University as a Master HVAC Technician. Campbell is the only African-American in the HVAC shop, a division within the PFOC, and only one of two Certified Master HVAC Technicians.

On August 28, 2002, Campbell settled a lawsuit with the University, releasing the University from claims of discrimination and racial harassment and retaliation. Campbell alleges that he continues to experience racial discrimination, racial harassment, and retaliation.

**Disciplinary Actions the University Took Against Campbell**

Since the settlement of Campbell's previous lawsuit, the University has disciplined Campbell on five separate occasions. Campbell has been disciplined for committing insubordination, twice violating the PFOC lunch-break policy, violating the PFOC "lockout/tagout" procedures, and falsifying records.

Insubordination

First, in 2003, the PFOC issued Campbell a verbal warning for insubordination because of his conduct toward his supervisor, Robert Kraus. During a "coaching session" with Kraus, Campbell allegedly "refused to discuss the subject" of the coaching session, and "acted in an inappropriate fashion," requiring Kraus to end the session prematurely. J.A. 38 (Aff. of Robert Kraus at ¶¶3-6). The University contends that in 2004, a white employee was also given a verbal warning for insubordination toward his supervisor.

Lunch breaks

Second, the PFOC disciplined Campbell for violating its lunch-break policy in 2003 and 2004. The PFOC requires an employee to take his lunch break from 11-11:30 a.m. each day, and to call his supervisor if he cannot take his break at the scheduled time.

In 2003, the PFOC issued a verbal warning to Campbell for taking his lunch break later than the scheduled time without receiving permission. Campbell had been working out (i.e., lifting weights) with James Carstarphen, an African-American Master Electrician within the PFOC, and James Stewart, an HVAC Master Technician at the University's Department of Residence Life and Housing, who was not a PFOC employee at the time. The PFOC also issued a verbal warning to Carstarphen.

In 2004, Campbell received a written warning for, again, taking his lunch break later than the scheduled time without first receiving permission. Campbell had been working out with Tim Howard (a white PFOC employee), Carstarphen, and Stewart. Campbell and Carstarphen both received written warnings, because for each it was his second offense, whereas Howard received a verbal warning because this was his first offense. After a grievance hearing, the PFOC dropped Campbell's written warning, and notified Campbell that if he took a late lunch again without asking permission, he would be suspended.

The University points out that "[i]n 2004, a Caucasian employee was disciplined for the same issue [of violating the lunch-break policy]" and that "other Caucasian employees received discipline

during the fiscal years of 2000-2003." J.A. 44 (Aff. of Sandra Smith). Campbell presents evidence that this policy is rarely enforced, including affidavits and deposition testimony of white employees stating that they have frequently violated the policy without being punished. J.A. 165 (Aff. of Tim Howard at ¶¶ 13-14); 168 (Aff. of Carl Myers at 2); 171 (Aff. of James Stewart at ¶¶ 19-22).

Campbell also points to evidence that Kraus has, on multiple occasions, falsely reported to Joseph Gregor, Director of Physical Facilities at the University, that Campbell returned late from lunch. J.A. 164 (Aff. of Tim Howard at ¶¶ 10-12). Finally, Campbell presents evidence that he was being "watched" by Gregor; Sandra Smith, Associate Director, Administration of the PFOC; and Kraus "because of his prior lawsuit and for voicing his opinions about his treatment." J.A. 162 (Aff. of James Carstarphen at 2).

Locks

Third, in December 2004, the PFOC disciplined Campbell for violating the PFOC "lockout/tagout procedure"—a new policy that was implemented on December 1, 2004. The PFOC designates certain locks for "lockout/tagout." Locks that are designated for "lockout/tagout" may only be used to lock out stored or kinetic energy—in other words, they may only be used on a machine with stored or kinetic energy that is turned off, to prevent the machine from being turned back on and possibly causing injury. The PFOC has a written policy to this effect and requires all employees to receive training.

The PFOC issued a verbal warning to Campbell for improperly using one of these

"lockout/tagout" locks to secure a ladder. The PFOC rescinded the warning after Campbell agreed to complete and passed another training course in "lockout/tagout" procedures.

The University contends that in October 2004, a white employee was given a verbal warning for violating the "lockout/tagout" policy. Campbell claims that after he was disciplined for violating the policy, he personally observed locks belonging to PFOC superintendents being used on lockers, in violation of the policy. Kraus stated that although such locks had been used on lockers in the past, these locks were not used on lockers after the new policy was adopted. Campbell also points to statements by other PFOC employees that the locks are commonly used improperly and no discipline comes from it. J.A. 162 (Aff. of James Carstarphen at 2-3); 165 (Aff. of Tim Howard at ¶¶ 17-18); 167 (Aff. of Carl Myers at 1); 172 (Aff. of James Stewart at ¶ 23-25).

Falsifying records

Finally, the PFOC disciplined Campbell for allegedly filling out an inaccurate timecard for February 1, 2005. On his timecard, Campbell wrote that he was working from 11 a.m. until 1 p.m. Both the University and Campbell agree that Campbell was at the weight room at some point during this time, with Campbell claiming that he was in the weight room for only five-to-ten minutes before he was called away on a job. Campbell also claims that videotape evidence against him was falsified. Campbell received a ten-day suspension for this action. The University presented evidence that "[t]here have been Caucasian PFOC employees suspended and recommended for termination by the PFOC for falsification of records" and that "Caucasian PFOC employees have been suspended

for 10 days for rules violations."  J.A. 45 (Aff. of Sandra Smith ¶ 16).

## Failure to Promote

Campbell alleges that on four separate occasions he was denied a promotion.  Campbell did not apply for the first position, interim Superintendent of the HVAC Shop, but did apply for the other three positions.

### Interim Superintendent

First, in late 2002, Campbell was not promoted to interim Superintendent of the HVAC Shop, a position that went instead to Kraus, who shortly before had been promoted to a full-time zone superintendent position.  The PFOC did not post the interim Superintendent position because, according to Gregor, he wanted a full-time superintendent in the position, and there was not enough time or money to go through the ordinary process of posting the opening and interviewing candidates.  Campbell claims that the failure to post this position "wasn't fair" but acknowledged that he did not believe that it was racial discrimination.  J.A. 77.  Kraus was subsequently given the Superintendent position on a full-time basis because, according to Gregor, Kraus had recently gone through the interview process to become a zone superintendent, and thus had the qualifications necessary for the position.

After Kraus was given the full-time position, Campbell complained to the University's EEO Officer.  Campbell claims that he then suffered harassment in the form of additional jobs that others

did not want to do and complaints about the amount of time he would spend on jobs (including an official investigation).

Superintendent of Maintenance

Second, Campbell applied for a position as Superintendent of Maintenance at the Student Recreation Center. This position, which was not within the PFOC, was awarded to Richard Grizer, a white man. Campbell alleged that he was denied this promotion because he is African-American. The University claims that it hired Grizer over Campbell because Campbell was less qualified, had less experience (particularly "with buildings trades issues and . . . pool operations"), and was not a "Certified Pool Operator." J.A. 62 (Aff. of Charles Kunsman at ¶¶ 6-7). The University also claims that being a "Certified Pool Operator" was a minimum requirement for the position.[1] Campbell admits that he did not know the qualifications or background of Grizer, but thought that the hiring was on the basis of race because Grizer was white, and because his treatment during the application process "wasn't fair." J.A. 103 (Dep. of Robert Campbell at 127-28).[2]

2004 Building Maintenance Zone Superintendent

Third, in December 2004, Campbell interviewed for the position of Building Maintenance

---

[1]Campbell claims that he has six years of experience in pool maintenance. The University claims that Campbell took the course to become a Certified Pool Operator, but failed that course.

[2]For example, Campbell alleges that a University employee told him to take the certification course, which cost $200, but he was told that someone had been hired on the day he took the certification test. J.A. 103.

Zone Superintendent within the PFOC. The committee that interviewed the candidates, which included Kraus, determined that James Miller, who is white, was the most qualified applicant.[3] The committee concluded that Miller "interviewed very well and possesses the leadership, experience and knowledge necessary" for the position, and stated that his "dedication, strong work ethic, supervision experience, knowledge of the campus and public relation skills" made him the first choice for the position. J.A. 47 (Def.'s Mot. for Summ. J., Ex. B-1). Campbell claims that Miller was not qualified because he "almost electrocuted himself" and he "used to hang lights up [incorrectly] and they'd fall on students." J.A. 99 (Dep. of Robert Campbell at 110-11). Campbell claims that the hiring of Miller over himself constituted racial discrimination because he was the most qualified applicant and because Miller is white.

#### 2005 Building Maintenance Zone Superintendent

Finally, in April 2005, Campbell interviewed for the position of Building Maintenance Zone Superintendent (in a different zone within the PFOC). The interview committee ranked John Gromofsky, who is white, as the most qualified applicant, concluding that he "interviewed very well and possesses the leadership, experience and knowledge necessary" for the position, and noted that he "demonstrates excellent communication skills, is very professional earning the respect of his peers and University colleagues" and is a "team player." J.A. 51 (Def.'s Mot. for Summ. J., Ex. B-2). The

---

[3]The committee did not rank Campbell as one of the top three applicants, and noted that although Campbell "interviewed well," he needed "to develop his communication and leadership skills." J.A. 47-49 (Def.'s Mot. for Summ. J., Ex. B-1).

committee ranked Campbell as the third most qualified applicant, but noted that the committee would not consider him if the first-choice applicant refused the position. The committee concluded that Campbell "interviewed well providing accurate answers to all of the interview questions," but that he "was not the most qualified candidate and deficient in his supervisory experience and leadership skills." J.A. 51. Gregor acknowledged that Campbell was qualified for the position, but stated that Campbell was not the most qualified candidate and was no longer under consideration for the position.

With respect to each of these positions, Campbell claims that he "was and is one of the most qualified employees" in the PFOC. *See* Campbell's Br. at 8. Stewart, Campbell's former supervisor, claimed that "Robert Campbell was more qualified to be a supervisor than was Rob Kraus[e]." J.A. 169-70 (Aff. of James Stewart at ¶¶ 2, 7, 13). Finally, Carstarphen stated that when he asked his supervisor, Mark Coontz, why Campbell had been denied the Zone Supervisor positions, Coontz stated that "as long as Gregor and that outfit are in charge there would be no brown skinned supervisors." J.A. 163 (Aff. of James Carstarphen at 3). Carstarphen also stated that Coontz told him to "watch out when Robert Campbell" was with him because Campbell was being "watched" and "target[ed]" by Gregor, Smith, and Kraus. J.A. 162 (Aff. of James Carstarphen at 2).

**Procedural History**

The district court granted the University's motion for summary judgment on all

counts—racial discrimination, retaliation, and racial harassment. The district court held that none of the disciplinary actions taken against Campbell—for committing insubordination, violating the lunch-break policy, violating the "lockout/tagout" policy, and falsifying records—constituted racial discrimination. For each form of discipline, the court held that Campbell failed to establish a prima facie case of discrimination because he could not show that similarly-situated white employees were treated more favorably than Campbell. For each form of discipline, the district court also held that, assuming that Campbell could establish a prima facie case of discrimination, the University provided a legitimate, non-discriminatory reason for the discipline that Campbell failed to show was pretext.

The district court also held that the University's failure to promote Campbell, on each of four occasions, was not racial discrimination. The court first held that Coontz's comment that under current management there would not be any "brown skinned supervisors" was not direct evidence of discrimination. The court then held that Campbell failed to establish a prima facie case of discrimination with respect to the University's failure to promote him to the interim Superintendent position in 2002, the Manager of Maintenance position in 2004, and the Zone Superintendent position in 2004, because Campbell failed to show that these positions were given to less qualified non-minorities. The court also held that even if Campbell were able to establish a prima facie case, the University presented legitimate, non-discriminatory reasons for not promoting Campbell, and Campbell did not rebut these reasons as pretext. Finally, with respect to the 2005 Zone Superintendent position, the district court held that although Campbell established a prima facie case because the position remained unfilled, the University again presented legitimate, non-discriminatory

reasons for not promoting Campbell that he did not rebut as pretext.

On Campbell's retaliation claims, the district court first held that Campbell's alleged direct evidence of retaliation (Coontz's comment that management was targeting and watching Campbell) was insufficient to establish a prima facie case because the evidence was a conclusory statement by a non-decision-maker. The court then held that Campbell's indirect evidence was insufficient to establish a prima facie case of retaliation because Campbell could not show a causal connection between the adverse employment actions and Campbell's exercise of protected activity.[4]

Finally, the district court granted summary judgment to the University on Campbell's claims of racial harassment. The district court found that Campbell's Response to the University's Motion for Summary Judgment failed to address this claim, and consequently reviewed only the sufficiency of the University's argument. The court found that Campbell's allegations that he is often forced to work alone and gets less favorable work assignments were not supported by evidence, and there was no evidence that these alleged forms of harassment were based on Campbell's race nor that they interfered with his work performance.

**Discussion**

---

[4]The district court also reiterated its rejection of Campbell's arguments that the University treated white employees differently, for the same reasons given in its discussion of Campbell's discrimination claims.

This court reviews the district court's order granting summary judgment *de novo*. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). A motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Campbell's evidence is to be believed, and all "justifiable inferences" are drawn in his favor. *See id.* at 255.

## 1.      **Discrimination**

It is unlawful under Title VII for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such discrimination in the making and enforcing contracts is prohibited under 42 U.S.C. § 1981. In the context of employment discrimination, the analysis of claims under § 1981 is identical to that under Title VII. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

To succeed in his race discrimination claims, Campbell must navigate the familiar *McDonnell Douglas* burden-shifting test. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). First, Campbell has the burden to establish a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Second, if Campbell makes such

- 13 -

a prima facie showing of discrimination, the University then has the burden "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *See id.* at 802; *Braithwaite*, 258 F.3d at 493. Finally, if the University successfully articulates a legitimate, nondiscriminatory reason for the adverse employment action, Campbell has the burden to show that the University's reason for the adverse employment action is pretext for what is, in essence, unlawful racial discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Braithwaite*, 258 F.3d at 493. Campbell "can demonstrate pretext by showing that the [University's] proffered reason (1) has no basis in fact, (2) did not actually motivate the [University's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

### a. Discipline

Campbell has presented sufficient evidence to establish a prima facie case of discrimination with respect to the discipline he received for violating the PFOC lunch-break and "lockout/tagout" policies,[5] and is able to rebut the University's purported legitimate, non-discriminatory reasons for the discipline as pretext. Campbell is not, however, able to establish a prima facie case of

---

[5]For reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were "adverse employment actions" actionable under Title VII. Therefore, we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute "adverse employment actions." *Compare Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) ("A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status."); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (holding that written warnings were not adverse employment actions in that case for either discrimination or retaliation purposes).

discrimination with respect to the discipline he received for committing insubordination and falsifying records. Because this is a disparate-treatment case, Campbell may establish a prima facie case of discrimination by showing "(1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992).

> i. *Warning for Insubordination*

The district court correctly held that Campbell did not establish a prima facie case of discrimination with respect to his discipline for insubordination because he failed to demonstrate that a similarly-situated white employee was treated less favorably for a similar act of insubordination. To establish a prima facie case of discrimination, Campbell must show that he was treated differently than similarly-situated white employees. *See id.* Campbell has not referred to any evidence in the record that would suggest that he was treated differently than similarly-situated white employees. In fact, the University provided evidence that a white employee was given a verbal warning for insubordination in 2004.

The district court also correctly concluded that, assuming Campbell could make a prima facie showing, the University had provided a legitimate non-discriminatory reason for the discipline in the form of evidence that Campbell had been insubordinate. The University presented evidence that Campbell was insubordinate by refusing to participate in a coaching session with Kraus and by calling Kraus a "racist" and a "baby face boy." *See* J.A. 41.

Campbell has not presented evidence sufficient to rebut the University's legitimate, non-discriminatory reason as pretext. Campbell can "demonstrate pretext by showing that the [University's] proffered reason . . . has no basis in fact." *Dews*, 231 F.3d at 1021. Campbell argues only that he was not insubordinate, and provides his own testimony as evidence. However, this court has held that "the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell*, 964 F.2d at 585. Here, Campbell has failed to present any evidence to show that the PFOC disciplined him for a reason other than his actual insubordination. He simply denies that he was insubordinate; that is not sufficient to demonstrate pretext.

In addition, this court has held in an unpublished decision that, in the context of discipline for violating employer rules, "an employer may successfully rebut any prima facie case of disparate treatment by showing that it honestly believed that the employee committed the violation." *Harris v. Elec. Data Sys. Corp.*, No. 94-1888, 1996 WL 99311, at *6 (6th Cir. Mar. 6, 1996); *see also Braithwaite*, 258 F.3d at 493-94. Campbell admits in his deposition testimony that he called Kraus "home boy" and said that Kraus was acting like a racist, that he raised his voice, and that the purpose of the meeting never was accomplished because he began an off-topic discussion of Kraus's abilities as a PFOC employee. Given these admissions, the University was justified in concluding that Campbell was being insubordinate. Regardless, Campbell does not challenge the fact that the University honestly believed that Campbell was being insubordinate.

  ii.  *Warnings for Violating Lunch-break Policy*

Campbell has made a prima facie showing that the discipline that he received for violating

the PFOC lunch-break policy, which required employees to notify their supervisors before taking a

lunch break outside of their allotted time period, was racial discrimination.  The PFOC twice

disciplined Campbell for violating the lunch break policy:  in 2003 (verbal warning) and in 2004

(written warning).  Both times, Campbell took his lunch break outside his scheduled time without

first receiving permission from a supervisor.

Assuming the employment action was sufficiently adverse, *see supra* note 5, Campbell has

established a prima facie case of discrimination because he has presented evidence that white

employees were treated differently for similar conduct. *See Mitchell*, 964 F.2d at 582-83.  Campbell

presented affidavits of other PFOC employees who claimed that they have violated the lunch break

policy without being disciplined and that the policy is commonly violated without the offenders

being punished. *See* J.A. 165 (Aff. of Tim Howard at ¶¶ 13-14) ("It was and still is common practice

for PFOC employees to return late from lunch.  The only people I know who received any discipline

for returning late from lunch are people like myself who were seen with Robert Campbell."); 168

(Aff. of Carl Myers at 2) ("I have personally started lunch late and gone over and never been

disciplined."); 171 (Aff. of James Stewart at ¶¶ 19-22) ("I know that it is common for workers to

return late from their lunch break when they have left late for their lunch break.  I was never

disciplined for returning late from lunch.  I have never known any white employee who was

disciplined for returning late from lunch.").  The district court rejected this evidence because it

determined that Campbell failed to establish that the PFOC knew that these employees had violated

the policy, and thus, these employees were not similarly-situated.  J.A. 232-34.

Campbell's evidence is sufficient to permit the inference that the PFOC did indeed have knowledge of violations of the lunch break policy.  On a motion for summary judgment, a court must believe the plaintiff's evidence and all "justifiable inferences" are drawn in his favor.  *See Anderson*, 477 U.S. at 255.  If a juror were to believe Howard, Myers, and Stewart, and determine that the lunch-break policy is commonly violated, the juror could easily make the small inferential step that the PFOC must have known that the policy was being violated.[6]  *See  EEOC v. Minneapolis Elec. Steel Casting Co.*, 552 F. Supp. 957, 963 (D. Minn. 1982) (finding widespread rule violations sufficient to establish that employer knew of violations).  Such an inference becomes even stronger when combined with the fact that Kraus admits to having violated the lunch-break policy on multiple occasions when he was a technician.  J.A. 205.

The University, though, argues that the fact that Howard, who is white, was disciplined for violating the lunch break policy is evidence that similarly situated employees were treated equally.[7]  However, Howard claims that the only time he was disciplined for violating the lunch break policy

_____

[6]The University presents evidence that a white employee was disciplined for violating the lunch policy in 2004. This appears to refer to Howard, who was with Campbell when Campbell violated the policy.  The University also presents evidence that other white employees were punished from 2000-03, but does not provide numbers or dates.  In light of the attestations of Howard, Myers, and Stewart, a reasonable jury could still believe that Campbell was being treated differently than white employees.

[7]The fact that Howard received a verbal warning whereas Campbell received a written warning is immaterial because this was Howard's first offense and Campbell's second.  Campbell also received only a verbal warning after his first offense.

was when he was with Campbell. Campbell also presents evidence showing that Gregor, Kraus, and Smith were targeting him, and that Kraus was spying on him when he would work out during his lunch break. If a juror believed this evidence, he or she could conclude that Howard was only punished because of his association with Campbell, or that he was only punished to avoid what would have been an otherwise unavoidable appearance of discrimination.

Campbell has also demonstrated that the University's purported legitimate, non-discriminatory reason for Campbell's discipline—Campbell's violation of the lunch-break policy—was pretext. To demonstrate pretext, Campbell may demonstrate that the University's reason "was insufficient to warrant [the University's] challenged conduct." *Dews*, 231 F.3d at 1021. Campbell has done this by providing evidence that could show that the PFOC knew about widespread violations of the rule, but only chose to punish Campbell. *See Perry v. McGinnis*, 209 F.3d 597, 602 (6th Cir. 2000) (noting that evidence of discipline of black employee for rule violations for which other employees were not disciplined supports argument that violation of rule was pretext for discipline); *cf. McDonnell Douglas*, 411 U.S. at 804 (stating that failure to fire white employees who engaged in same act that was employer's purported reason for firing black employee could be evidence of pretext). Therefore, Campbell has met his burden of establishing pretext.

### iii.     *Warning for Violating "Lockout/tagout" Procedures*

Campbell also established a prima facie case of discrimination with respect to the verbal warning he received for violating the PFOC "lockout/tagout" policy by using a "lockout/tagout" lock

to secure a ladder because he presented evidence that he is the only PFOC employee to have been disciplined for violating the policy and that other employees frequently violate the policy without being disciplined. *See Mitchell*, 964 F.2d at 582-83. Carstarphen claimed that "lockout/tagout" locks "are used for many purposes including locking up equipment, ladders, generators, tools, tool boxes, and lockers." J.A. 162. Stewart claimed that he had used "lockout/tagout" locks improperly in the past without being disciplined, and that the locks are "routinely and customarily" used improperly, yet the only employee he knows of who was punished for it is Campbell. J.A. 172. In addition, Campbell claims to have personally observed the improper use of "lockout/tagout" locks on lockers after he was disciplined.

The University argues that evidence that white employees had violated the policy without punishment is insufficient to establish a prima facie case because these employees were not similarly-situated in that (1) there was no evidence that these employees were ever caught and not disciplined; and (2) Campbell did not show that these employees violated the new policy (instituted in December 2004) instead of the old policy. Although the question is close, the record shows sufficient evidence to get past summary judgment. First, a reasonable juror could infer from evidence that employees "routinely and customarily" used "lockout/tagout" locks improperly and from evidence that Campbell personally observed these locks being used in the open on lockers, that management was aware that other employees were violating the policy. Second, a reasonable juror could infer from Campbell's evidence that white employees continued to use "lockout/tagout" locks improperly under the new policy. Campbell claims to have personally observed improper use of the

locks *after* he was punished under the new policy. J.A. 87. Also, the claims of widespread misuse

of locks by Stewart and Carstarphen, although not explicitly stating a time frame, permit an inference

that the misuse of the locks continued after the new policy was adopted in December 2004. For

example, Stewart stated in an affidavit dated July 29, 2005, that these locks "*were and are* routinely

and customarily" misused in the PFOC. Therefore, Campbell's evidence is sufficient to establish

a prima facie case of racial discrimination.

Campbell also successfully rebuts the University's purported legitimate, non-discriminatory

reason for the discipline—violation of the "lockout/tagout" policy—as pretext.[8] Campbell may

demonstrate pretext by showing that the University's proffered reason "was insufficient to warrant

[the University's] challenged conduct." *Dews*, 231 F.3d at 1021. Campbell's evidence that

similarly-situated white employees were not disciplined for violating the "lockout/tagout" policy is

sufficient to permit a finding of pretext. *See Perry*, 209 F.3d at 602.

> iv.     *Suspension for Falsifying Records*

The district court correctly held that Campbell's ten-day suspension in February 2005 does

not establish a prima facie case of racial discrimination. To establish a prima facie case of

discrimination, Campbell must show that he was treated differently than similarly-situated white

---

[8]The University argues that evidence that a white employee was punished in 2004 shows that similarly situated employees were treated similarly. However, in light of Campbell's evidence that the "lockout/tagout" policy was routinely violated by white employees who were not disciplined, there is still a genuine issue of material fact for the jury.

employees. *See Mitchell*, 964 F.2d at 582-83. The only evidence Campbell refers this court to is his claim that the videotape which served as evidence in Campbell's disciplinary hearing was altered or falsified. *See* J.A. 92-93. Campbell has not alleged that white employees who were caught falsifying records were not similarly disciplined. Therefore, Campbell failed to establish a prima facie case of discrimination.

The district court also correctly concluded that, even had Campbell established a prima facie case of discrimination, the University presented a legitimate, non-discriminatory reason for the discipline that Campbell has not shown to be pretext. The University presented evidence that white employees, in fact, have been suspended and recommended for termination for falsifying records. J.A. 45. Campbell's mere allegation that the evidence against him was altered is insufficient to show pretext. *Mitchell*, 964 F.2d at 585 (holding that "the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment").

### b. Failure to Promote

Campbell fails to establish racial discrimination with respect to the University's failure to promote him. Campbell attempts to use both direct and indirect evidence to establish discrimination. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

Campbell's supposed direct evidence of discrimination with respect to the University's failure to promote him is insufficient. "[D]irect evidence is that evidence which, if believed, requires

the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). If Campbell can establish direct evidence of discrimination, the University then has the burden to show that it would have taken the same adverse employment action without the motivation of discrimination. *See id.* Here, Campbell's direct evidence of discrimination is that Carstarphen attested that his supervisor, Coontz, said that "as long as Gregor and that outfit are in charge there would be no brown skinned supervisors." J.A. 162.

The district court held that this was not direct evidence of discrimination because the record contradicts Coontz's statement and because Coontz was not a decision-maker with respect to the promotions Campbell did not receive. Coontz's statement is not direct evidence of discrimination because it is presented as simply Coontz's opinion of the motives behind the PFOC's management decisions. The record does not suggest that Coontz based this statement on any objective evidence such as statements made by Gregor or other management officials within the PFOC. This court has held that "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of" discrimination. *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (age discrimination); *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (racial discrimination). Therefore, Coontz's conclusory comment is not sufficient direct evidence of discrimination.[9]

---

[9]For the same reason, we also reject Campbell's argument that Coontz's comment is indirect evidence of discrimination.

Campbell also presented indirect evidence of discrimination with respect to the University's failure to promote him on four separate occasions. Campbell can establish a prima facie case if he shows that "(1) [he] is a member of a protected class; (2) [he] applied for and was qualified for a promotion; (3) [he] was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time [Campbell's] request for the promotion was denied." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005).

### i. Interim Superintendent

First, Campbell cannot establish a prima facie case of discrimination with respect to the University's failure to promote him to the interim position of Zone Superintendent in 2002. To establish a prima facie case, Campbell must show that his qualifications for the position were similar to Kraus's. Campbell has not alleged that he had similar qualifications, only that Kraus was not as qualified as he was, according to his own opinion, and the opinion of Stewart (the former supervisor of both Campbell and Kraus). Furthermore, the evidence Campbell presents is not the objective evidence of qualifications required for establishing a prima facie case. *See Wexler*, 317 F.3d at 575 ("At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job.").

The district court also correctly held that, even if Campbell were able to establish a prima facie case, the University's explanation that Kraus was promoted because he was already a

supervisor was not shown by Campbell to be pretext. Gregor testified at his deposition that the reason the position was not posted was because Kraus volunteered, and Kraus was hired because there was a need for someone to fill that position quickly. Campbell has not provided any evidence to suggest that this reason was pretext.

### ii. Superintendent of Maintenance

Second, the district court correctly held that Campbell failed to satisfy his burden of establishing a prima facie case of racial discrimination with respect to the University's failure to promote him to Manager of Maintenance for the Department of Student Recreation and Wellness Services in 2004. Campbell cannot show that he had qualifications similar to the person who was given the job, Richard Grizer. One of the minimum requirements for the job was that the applicant be a "Certified Pool Operator or equivalent." J.A. 61, 64. Campbell was not a "Certified Pool Operator," and, in fact, failed the test to become one.[10] Campbell has not alleged that Grizer is not a "Certified Pool Operator" or is otherwise unqualified for the position.

Even if Campbell were able to establish a prima facie case, he has not shown that the University's reason for promoting Grizer instead of him—the fact that Campbell was not a "Certified Pool Operator"—was pretext. In his deposition testimony, Campbell, when asked why he thought

---

[10]Campbell argues that he has similar qualifications because he has six years of experience in pool maintenance. But the fact that Campbell did not pass the certification exam suggests that his experience was not the equivalent of actual certification. Regardless, because Campbell cannot rebut as pretext the University's legitimate non-discriminatory reason for hiring Grizer, he still cannot prevail on this claim.

the University's failure to promote him to this position was racial discrimination, only answered that it was because Grizer is white and that he was led to believe that he could take the certification course and be considered for the job. This evidence is insufficient to show pretext because it is not evidence that the employer's legitimate, nondiscriminatory reason for hiring Grizer "(1) has no basis in fact, (2) did not actually motivate the [University's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *See Dews*, 231 F.3d at 1021.

### iii. *2004 Building Maintenance Zone Superintendent*

Third, the district court correctly held that Campbell failed to establish a prima facie case of discrimination with respect to his lack of promotion to the position of Building Maintenance Zone Superintendent in December 2004. The court held that Campbell did not establish a prima facie case because he failed to present evidence showing how he was more qualified than James Miller, the white man who got the job.

Campbell does not point to any evidence in the record showing that he and Miller had similar qualifications for the Superintendent position. Campbell only makes the conclusory statement that he was the most qualified applicant and states that Miller once "almost electrocuted himself" and "used to hang lights up [incorrectly] and they'd fall on students." J.A. 99. First, Campbell's statement that he was the most qualified applicant cannot establish a prima facie case of discrimination because personal beliefs are insufficient to support an inference of discrimination. *Chappell*, 803 F.2d at 268. Second, Campbell's deposition testimony that Miller made mistakes in

the past is also insufficient because Campbell does not show how those mistakes made during the course of Miller's employment as a technician relate to his qualifications as a supervisor, and Campbell's testimony does not concern the types of objective qualifications this court examines to determine whether a prima facie case has been established. *See Wexler*, 317 F.3d at 575-76 (stating that with regard to consideration of the plaintiff's qualifications, "the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills").

Even if Campbell were able to establish a prima facie case of discrimination, the district court correctly held that Campbell could not rebut as pretext the University's legitimate, non-discriminatory reasons for choosing Miller over Campbell. The University offered as evidence a memorandum summarizing the selection committee's assessment of each candidate for the position as well as the committee's recommendations. The committee determined that Miller "interviewed very well and possesses the leadership, experience and knowledge necessary" for the position, and stated that his "dedication, strong work ethic, supervision experience, knowledge of the campus and public relation skills" made him the first choice for the position. The committee also determined that although Campbell "interviewed well," he "needs to develop his communication and leadership skills." Campbell has failed to present additional evidence showing that these reasons were pretextual.

    *iv.    2005 Building Maintenance Zone Superintendent*

- 27 -

Fourth, even though Campbell established a prima facie case of discrimination with respect to the University's failure to promote him to Superintendent in 2005 because the position remains unfilled,[11] *see McDonnell Douglas*, 411 U.S. at 802; *White*, 429 F.3d at 240 n.3, the district court correctly concluded that the University presented a legitimate, non-discriminatory reason for failing to promote Campbell, which was not rebutted by a showing that the reason was pretextual. The University again presented a memorandum summarizing the selection committee's assessment of each candidate for the position and the committee's recommendations. The committee concluded that John Gromofsky, a white male, was the most qualified candidate because he "interviewed very well and possesses the leadership, experience and knowledge necessary" for the position, and he "demonstrates excellent communication skills, is very professional earning the respect of his peers and University colleagues" and is a "team player." The committee ranked Campbell as the third most qualified applicant, but noted that it would not consider him if the first-choice applicant refused the position. The committee concluded that Campbell "interviewed well providing accurate answers to all of the interview questions," but that he "was not the most qualified candidate and deficient in his supervisory experience and leadership skills." Campbell has failed to present any evidence suggesting that these reasons were pretextual, other than the conclusory statement that "[t]he fact that positions are left unfilled, rather than filled by a qualified black man, more than raised the specter

---

[11]The selection committee made its recommendations to Smith on April 22, 2005. Gregor acknowledged that the position had not yet been filled during his deposition testimony taken May 13, 2005, but stated that John Gromofsky, the committee's first choice, was still under consideration for the position. It is not clear from the record whether this position still remained unfilled at the time of the district court's decision, or remains unfilled today.

of pretext." Campbell's Br. at 23.

        c.        *Unfavorable Job Assignments*

We decline to address Campbell's argument that the fact that he was assigned to "dirtier" jobs and forced to work alone more frequently than other employees constituted discrimination, because Campbell failed to make this argument until his Reply Brief to this court. This court has held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005). Nowhere in Campbell's initial Brief or his Response to the University's Motion for Summary Judgment does Campbell argue that the University discriminated against him by giving him less favorable assignment or requiring him to work alone more often than other employees. Campbell's mention of this argument in his Reply Brief is insufficient to avoid waiving the argument.[12] *See, e.g.*, *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004).

## 2.    <u>Retaliation</u>

Campbell has established a prima facie case of retaliation with respect to the discipline he received for violating the PFOC lunch-break and "lockout/tagout" policies. Although the University presents legitimate, non-discriminatory reasons for Campbell's discipline, Campbell successfully rebuts these reasons as pretext.

---

    [12]For the same reasons, any argument that Campbell's receipt of unfavorable job assignments constituted retaliation is also waived.

To establish a prima facie case of retaliation under Title VII and § 1981, Campbell must show that "(1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to [the University]; (3) [the University] thereafter took adverse employment action against [Campbell]; and (4) there was a causal connection between the protected activity and the adverse employment action."[13] *Ford v. General Motors Corp.*, 305 F.3d 545, 552-53 (6th Cir. 2002).

The University concedes the first three elements of the prima facie case.[14] University's Br. at 32. Therefore, the only element in dispute is whether there was a causal connection between the protected activity (Campbell's filing of complaints and previous lawsuit against the University) and the adverse employment action (the University's discipline of and failure to promote Campbell). To establish a causal connection, Campbell must show either (1) temporal proximity between his exercise of protected rights and adverse employment actions, alone; or (2) temporal proximity in addition to disparate treatment.

---

[13]Campbell also claims that Coontz's comments that no brown-skinned employee would be promoted while Gregor was in charge, and that Gregor and other PFOC management were targeting Campbell, are direct evidence of retaliation. We reject Campbell's argument for the same reasons stated above with respect to Campbell's claims of racial discrimination. Coontz's comments reflect only conclusory statements of opinion and are not admissible evidence to show discrimination or retaliation.

[14]Again, the University concedes the adverse action element of the retaliation claim with respect to verbal reprimands and warnings. In *Burlington Northern & Santa Fe Railway Co. v. White*, – U.S. –, 126 S. Ct. 2405, 2414-16 (2006), the Supreme Court recognized that the standard for retaliation is not as high as the standard for discrimination under Title VII. The Court held that, to prove retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

First, Campbell possibly may establish a prima facie case with evidence of only temporal proximity. However, this court has not before held that a difference in time of six months or more is short enough—without more evidence—to permit an inference of retaliation. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months."). The only action Campbell alleges as retaliation that occurred within six months of his settlement on August 28, 2002, or his EEOC complaint on October 10, 2003, was the discipline for his lunch break in Fall 2003, which is discussed below. Campbell does not appear to allege that the University's failure to promote him to interim Supervisor in late 2002 was in retaliation for his lawsuit, which is consistent with the fact that Campbell had not previously expressed interest in a promotion (i.e., the University could not have retaliated against Campbell by denying him a promotion it did not know he wanted).

Second, Campbell can establish a prima facie case of retaliation with respect to the University's discipline of him for violating the lunch-break and "lockout/tagout" policies by evidence of close temporal proximity combined with evidence of disparate treatment. *See Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that causal connection "may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees").

The only adverse employment actions for which Campbell has made a prima facie showing that he was treated differently from other employees were the discipline for his violation of the

"lockout/tagout" and lunch-break policies.[15] Campbell's discipline for violating the lunch-break policy came in Fall 2003 and Fall 2004. His discipline for violating the lockout/tagout policy came in December 2004. At most, the discipline for all three violations of PFOC policy came just over one year after an adverse employment action. This temporal nexus, when combined with evidence of disparate treatment, appears sufficient to permit a reasonable juror to infer that the discipline was retaliatory. *See, e.g.*, *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001) (holding as sufficient a time difference of less than a year between one EEOC complaint and plaintiff's suspension and termination, and three months between a second EEOC complaint and plaintiff's suspension and termination, combined with evidence of disparate treatment and evidence that the employer encouraged employees to make false allegations against plaintiff); *Harrison v. Metro Gov't of Nashville*, 80 F.3d 1107, 1119 (6th Cir. 1996) (holding as sufficient a time difference of, at most, fifteen months, combined with evidence that employees who testified at plaintiff's EEOC hearing feared retaliation for doing so and comments by supervisor that "suggested he would not hesitate to run employees out of his department").

Once Campbell establishes a prima facie case of retaliation, the same burden-shifting *McDonnell Douglas* test applied above with respect to discrimination controls. *See Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 563-64 (6th Cir. 2004). Because the test and

---

[15]Campbell also presents evidence that he was being spied on by Kraus and Kraus's wife. *See* J.A. 164 (Aff. of Tim Howard at ¶ 9) ("Kraus[e] had to go out of his way to watch Campbell. If Kraus[e] was not available, Kraus[e]'s wife, April Kraus[e], who works at the [place where Campbell works out during lunch], monitored us from [the] security camera system and kept Kraus[e] informed."). This evidence, if anything, makes the prima facie case of retaliation stronger.

analysis remain the same, the outcome regarding each alleged form of retaliation is the same as the outcome regarding each alleged form of discrimination. Therefore, Campbell can rebut as pretext the University's purported legitimate reasons for disciplining Campbell for violation of the "lockout/tagout" and lunch-break policies, but not for his insubordination and falsification of his timecard, nor for the University's failure to promote him.

3.      **Harassment**

Campbell waived his right to appeal the district court's grant of summary judgment to the University on Campbell's claims of racial harassment.[16] Again, this court has held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Dillery*, 398 F.3d at 569. Although the word "harassment" is sprinkled throughout Campbell's Brief to this court, Campbell's Brief does not have a separate section devoted to racial harassment, does not state the legal standard for prevailing on a claim of racial harassment (even though it does for the discrimination and retaliation claims), and does not refer to a single case that illustrates why his alleged treatment by the University constitutes racial harassment. The fact that Campbell's Brief is devoid of analysis of racial harassment even after the district court concluded that Campbell had not responded to the University's summary judgment motion makes the

---

[16]The district court also determined that Campbell failed to address this claim in his Response to the University's Motion for Summary Judgment. J.A. 248.

conclusion that Campbell has abandoned his racial harassment claim even stronger.[17]  Therefore, we hold that Campbell waived his right to appeal that part of the district court's order granting summary judgment to the University on his racial harassment claims.

## Conclusion

Finally, we note that our disposition of this case reflects only the smallest of disagreements with the district court below:  we conclude that evidence of widespread rules violations permits a rational juror to infer that an employer knew about the rules violations.  We do not make that inference here, but decide only that it is for a jury to decide.  For the reasons stated above, we **REVERSE**, in part, the judgment of the district court and **REMAND** this matter for further proceedings consistent with this opinion.

---

[17]Also, in his Reply Brief to this court, Campbell fails to respond to the University's analysis of Campbell's racial harassment claim, which consists of, in full:  "Campbell abandoned this argument below and does not appear to have revived it here."  *See* University's Br. at 41.