**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0013n.06
**No. 16-3563**

|  |  |  |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED** Jan 06, 2017 DEBORAH S. HUNT, Clerk |
| DENISE PRESLEY, | ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, | ) ) ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

**BEFORE:** **BATCHELDER, STRANCH, and DONALD, Circuit Judges**

**JANE B. STRANCH, Circuit Judge.** Denise Presley, a nurse at Toledo Correctional Institution, brought race and sex discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against her former employer, the Ohio Department of Rehabilitation and Correction (ODRC). Presley alleged that ODRC discriminated against her on the basis of race by failing to promote her, engaging in disparate discipline, improper reassignment and constructive discharge, and also discriminated against her on the basis of sex. The district court granted summary judgment to ODRC. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

Denise Presley began working as a registered nurse in 2003, first at Toledo Hospital, and then at the Ohio Department of Mental Health's Northwest Hospital. Presley was terminated

from Northwest Hospital in March 2012, after a series of disciplinary incidents, many involving patient care. Presley's union challenged her removal, and she entered into a settlement agreement that, among other conditions, rescinded her removal and transferred her to the Toledo Correctional Institution (ToCI), under an extended probationary period of one year. Presley began working at ToCI in May 2012 and successfully completed her probationary period.

In July 2013, Presley was given counseling for improperly handling a pill call. Presley disputes that the counseling was warranted, and states that a white nurse handling a pill call at the same time and in the same manner was not given similar counseling. In August, Presley was investigated for several errors: mishandling a patient's medication, failing to fully document an inmate's medication order, and arriving at work two hours late. Presley asserts that she actually properly handled the medication and documentation in the first two instances, but that the Medication Administration Record (MAR) was missing. The MAR was later found, and Presley alleges that she was blamed after a second shift nurse re-wrote the order incorrectly.

Presley received a pre-disciplinary conference notice for the medication issue in October 2013. As part of the notice, she received several documents detailing her medical errors. Presley alleges that in preparing this investigatory interview report, supervisor Kim Henderson reviewed documents that also showed a white nurse, Hannah Godsey, had made the same errors concerning dates or durations or prescriptions, but that Henderson ignored those errors in favor of pursuing an investigation into Presley. Presley appeared at her disciplinary hearing with her union representative. A settlement agreement, finalized in April 2014 following Presley's return from medical leave, ultimately imposed a one-day working suspension without loss of pay.

With Laura Burkin's resignation as Nurse Supervisor in August 2013, a white nurse, Hannah Godsey, was placed into the position on a temporary basis and the job opening was

posted for a permanent replacement. Presley alleges that while the formal announcement of Godsey's placement in the interim position came in August, the decision was made at least as early as June or July, when Tara Pinski, Labor Relations Specialist, announced that Godsey would be Burkin's replacement. Presley states that when she asked another nurse why the interim position was not posted to allow everyone to apply, she was told that the "decision about the Interim position had already been made." Presley discussed the issue with her union representative, but took no further action.

When the permanent position was posted, it was listed as a bargaining unit position. According to Presley, this was typical for the same position at other ODRC medical facilities, though she acknowledges that it was not a bargaining unit position when held by Burkin. ToCI states that the position was always intended to be exempt, and characterizes the bargaining unit position posting as a "typographical error." Presley asserts that as the most senior person in the RN's union, she had a right to the bargaining unit position based on her seniority.

She applied for the position and interviewed with a panel of other nurses and administrators. Presley later testified that if she thought Nurse Supervisor was an exempt position and she would no longer have union protection, she probably would not have applied for the position. Presley states that she did not have any problem with the interview, did not experience any hostility from the interviewers, and that the issue of whether the position was in the bargaining unit did not arise. During the interview, Warden Edward Sheldon told Presley that she performed well, though he later testified that other interviewers and her supervisors told him that she had a reputation as a "[m]arginal employee" and "average RN." (R. 24 at PageID 938) Jamey Wildman, one of the interviewers and also a nurse at ToCI who worked as a Quality

Improvement Coordinator (QIC), testified that he was "not impressed" with Presley's nursing skills or interactions with co-workers based on their prior experience together.

In November 2013, Godsey was appointed to the permanent Nurse Supervisor position. Wildman testified that despite her position as interim Nurse Supervisor, it was not "preordained" that Godsey would receive the promotion. Presley filed a charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission (EEOC), stating that she "bid on a union supervisor position [and] had an interview," she was the "top seniority RN at the facility," and she was the best candidate for the position based on her seniority and experience. Her complaint alleged that the job had instead gone to a "younger white female with less seniority." (R. 22-59 at PageID 649)

Presley alleges that Godsey admitted, during her deposition, to making medical errors in failing to provide dates and durations on medical records, and was not disciplined for these errors either before or after her promotion. Presley claims that these errors are generally known by other nurses at the facility and that Godsey's admissions reflect a serious lapse of knowledge. Godsey recalls being disciplined twice during her time at ODRC: first, for failing to count syringes and medications, and second, for failing to advise her supervisor that a QIC had a restriction on his license. Presley alleges, based on the testimony of another ToCI nurse, that Godsey was "lazy, very lax in her duties, and mostly played around, flirting and socializing." (R. 31-4 at PageID 1503) Presley further states that management was aware of Godsey's improper behavior, because it was reported to her then-supervisor, Glen Tappan. Presley herself reported some of Godsey's errors to Wildman in his capacity as QIC.

During this time, Michael Mathews, a white male nurse at ToCI, was also being reported and investigated for mistakes. Presley alleges that Mathews made errors such as failing to give

inmates their medication, improperly recording medication given to an inmate who had been discharged, and falsifying documents. In March 2014, Godsey, Mathews's supervisor, prepared an investigatory report covering an allegation that Mathews had been caught sleeping during his shift. Mathews had previously been found sleeping on duty by Kim Henderson, who had given him a verbal warning. ToCI employees are subject to ODRC Standards of Employee Conduct (the Standards), which include a disciplinary grid providing for progressive discipline. Presley alleges that Mathews's disciplinary logs show that he was not disciplined for his errors in accordance with the Standards. Specifically, Mathews's log does not list his first infraction for sleeping on the job, and no discipline was imposed for the second. The Standards require a five-day fine, suspension, or working suspension, or removal for a second offense of sleeping on duty. Tara Pinski recommended a two-day suspension for Mathews's second offense, but her recommendation was not submitted in accordance with the terms of the collective bargaining agreement. As a result, the discipline could not be imposed.

Presley went on leave for a non-work related injury in November 2013, and returned in April 2014. Upon Presley's return to work, Wildman observed her make several errors. She received additional training to cover processing orders for medications, and properly creating and continuing MARs. On June 4, 2014, Presley participated in another interview to discuss medical errors she had made since her return. The next day, Presley emailed the Warden, asking to meet with him. She stated that she was concerned that she was "being singled out and harassed" and that she was "the only state African American worker in the department." (R. 22-72 at PageID 676-77) She expressed concern about returning to work after five months of medical leave, and that many policies had changed that she was "not made aware of and need[ed] to be refreshed on" rather than punished for. (*Id.*) Presley met with Deputy Warden

Corey Foster, who was responsible for the medical department, and discussed her documentation errors. Foster told her that missing documentation still constituted a medical error that required the institution to write her up.

On June 12, 2014, Presley processed a medical order for an inmate and erroneously discontinued his prescription medication, which resulted in the inmate not receiving his immunosuppressant medication for one or two weeks. Following this incident, Presley was reassigned from work involving patient care to a position in medical records. Wildman, who maintained supervisory capacity over Presley, testified that she had made numerous errors since returning from leave and the chances of an inmate being injured "due to poor nursing practice" were high with Presley in patient care. (R. 23 at PageID 779) Wildman stated that the decision to reassign Presley to records was proper, based on patient safety. Presley claims that the transfer was humiliating, and that it was unheard of for a nurse who had been relieved of her duties pending investigation to be reassigned to such a position. She asserts that all other nurses who had been relieved of their duties pending investigation were put on paid administrative leave. About a month after her transfer, Presley met with Human Resources of ToCI to sign resignation papers, which indicated she was resigning for medical reasons. Shortly thereafter, Presley spoke with an ODRC investigator and told him that ToCI had been a stressful place to work, and that "Caucasians make mistakes and are not disciplined." (R. 22-79 at PageID 687)

After receiving a Notice of Right to Sue from the EEOC, Presley filed suit in district court, alleging discrimination on the basis of race for failure to promote, disparate discipline, and reassignment and constructive discharge, and for sex discrimination, in violation of Title VII of the Civil Rights Act of 1964. ODRC filed a motion for summary judgment, which was granted by the district court. The court concluded that Presley could not show that ODRC's failure to

promote her to Nurse Supervisor over Godsey was pretext for race discrimination, and rejected Presley's claim that she was disciplined more frequently because of her race or that ODRC's reason for disciplining her was pretext for racial discrimination. On her claim of race discrimination for reassignment and constructive discharge, the court determined that Presley could not show that ODRC intended to force her to quit, or that its determination that she posed a danger to patients was pretext for discrimination. Additionally, the court concluded that Presley failed to make a prima facie case for sex discrimination because she was not similarly situated to Mathews, who had been found sleeping on duty.

## II.      ANALYSIS

This court reviews a district court's grant of summary judgment de novo and considers the facts and any inferences drawn in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The burden falls to the moving party to demonstrate that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The central question at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Title VII prohibits an employer from discriminating against any person with respect to the terms, conditions, or privileges of her employment based on race or sex. 42 U.S.C. § 2000e-2(a)(1). To establish a discrimination claim under Title VII, plaintiffs must present either direct or circumstantial evidence of discrimination by an employer. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). Because Presley offers circumstantial evidence of discrimination by ODRC, we apply the burden-shifting framework set forth in *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). The first step of the framework requires the plaintiff to establish a prima facie case of discrimination. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Presley's claims generally require establishing the same prima facie case. She must show that she (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or was treated differently from a similarly situated, non-protected employee. *Id.* We have "held consistently that a plaintiff's burden of establishing a prima facie case is not an onerous one." *Wheat*, 785 F.3d at 237. Once the plaintiff proves this prima facie case, the employer has the burden to put forth a legitimate, non-discriminatory reason for the employment action taken against the plaintiff. *Baxter Healthcare*, 533 F.3d at 391. If the employer provides such a reason, the burden once more shifts to the plaintiff to show that the reasons offered by the employer were pretext for unlawful discrimination. *Id.* at 391-92.

### A.      Race Discrimination Claims

Presley alleges that ODRC discriminated against her on the basis of race by promoting Godsey to Nurse Supervisor, disciplining Presley more harshly than her white co-workers, and reassigning her to an administrative position, which she argues was a constructive discharge. The district court granted summary judgment to ODRC on all of these claims.

#### 1.      Failure to Promote

The district court determined that ODRC did not seriously contest Presley's prima facie case on her failure to promote claim, but argued instead that she could not show that ODRC's reason for hiring Godsey was pretext for discrimination. The court agreed, finding that Presley could not show she was so clearly more qualified than Godsey as to suggest pretext. On appeal, Presley first argues that ODRC discriminated against her by promoting Godsey instead of

Presley, though Presley had more seniority. As evidence of pretext, Presley points to "irregularities" in the application and selection process, such as the initial bargaining unit position posting and comments suggesting that Godsey had been pre-selected for promotion.

On appeal, ODRC argues that Godsey was not similarly situated to Presley at the time of promotion because Godsey already held the interim Nurse Supervisor position, and thus Presley cannot establish her prima facie case. We disagree. This takes too narrow a view of an adequate comparator, who need only be similarly situated in the "relevant aspects" to the plaintiff's employment situation. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Godsey is a white, female nurse at ToCI, who sought the same promotion as Presley. This is sufficient to show that Godsey was similarly situated to Presley and to establish the final component of her prima facie case.

ODRC asserts that its legitimate, non-discriminatory reasons for promoting Godsey were the support of management and the trust it placed in her, as shown by the recommendations of other supervisors and the interview panel's finding that she was the best candidate for the promotion. To show that these reasons were pretext for discrimination, Presley must provide "other probative evidence of discrimination[] that . . . taken together with evidence that [she] was as qualified as or better qualified than" Godsey could create a genuine dispute of material fact. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006). If there is "little or no other probative evidence of discrimination, . . . the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627.

Presley argues that she was objectively far more qualified for the position than Godsey. As evidence, she asserts that Godsey made numerous medical errors prior to her appointment as Nurse Supervisor. The record shows that Godsey was disciplined twice during the time she was employed at ODRC, once for failure to count syringes and medications and another time for failing to advise her supervisor that a QIC had a restriction on his license. The record also shows that complaints were made about Godsey to her then-supervisor, Glen Tappan, and Presley testified that she herself reported some of Godsey's errors to Wildman. This evidence shows that Godsey did not have a spotless record as a nurse at ToCI at the time of her promotion to Nurse Supervisor.

But to show pretext based on qualifications alone, Presley must show that no reasonable employer would have chosen Godsey over her because Presley's qualifications were significantly better than Godsey's. *Bender*, 455 F.3d at 627. The record reveals that Godsey had worked at ToCI over two years longer than Presley and that Presley had been employed at ToCI following performance problems at her prior job and came subject to a full year of probation. At the time of the promotion decision, Presley was under investigation for mishandling an inmate's medication, and had previously been given a warning for improperly handling a pill call. In light of this record, Presley cannot show that her qualifications were so significantly better than Godsey's as to make ODRC unreasonable for passing over her for the promotion. Presley has shown only that she was at least as qualified as Godsey, and she therefore must provide other probative evidence of discrimination to show pretext. *Id*.

Presley offers "irregularities" in the promotion process as such evidence, namely that the position was originally listed as bargaining unit and indications that Godsey had been pre-selected for the position. For the latter, Presley points to a statement by Tara Pinski to two other

nurses in June or July 2013 that Godsey was "going to be their boss." (R. 31-2 at PageID 1496-97; R. 31-3 at PageID 1499) One of the nurses, Derek Urban, testified that Pinski made this remark prior to a meeting to discuss conflict between nurses and management, after Urban inquired as to why Godsey was present. Urban testified that he found Godsey's presence inappropriate because the meeting was partially called to discuss complaints against her, and that after he expressed this, Pinski told him that Godsey was going to be selected for promotion. But the testimony in the record does not show that: this statement was more than Pinski's opinion as to which nurse would likely fill the opening; Pinski was involved in the hiring process; or that she received information that Godsey was being selected from someone involved in the process. Even seen in the light most favorable to Presley, this statement does not constitute probative evidence of discrimination on the basis of race that rises to the level of pretext.

The fact that the position was originally posted as bargaining unit and then changed to exempt, Presley argues, is also probative evidence of discrimination, because as the nurse with the most seniority, she would have been given the promotion if it had been a bargaining unit position. Though ODRC argues that there is no evidence the position was ever intended to be in the bargaining unit, the record is clear that the position was originally posted as a bargaining unit job. ODRC contends that this was a typographical error, but provides no information as to how the error occurred, or when or why it was changed to an exempt position.

Nevertheless, the two previous Nurse Supervisors at ToCI were exempt employees, and internal ODRC documents from the hiring process support its contention that the position was always treated as exempt. In addition, the fact that ODRC conducted interviews and had a hiring committee recommend the best candidate reinforces its position. Presley, moreover, was interviewed for the position and testified that she had no complaints about the interview.

Though this presents a close case, the evidence offered by Presley, taken in the light most favorable to her, fails to establish a genuine dispute of material fact that ODRC's proffered reasons for failing to promote Presley were a mere pretext masking race discrimination.

2.      Disparate Discipline

Presley next argues that ODRC discriminated against her by disciplining her more frequently than Godsey. The district court determined that Presley failed to meet two elements of her prima facie case: that she had suffered an adverse employment action and was treated differently than a similarly situated nurse. Even if Presley had made her prima facie case, the district court determined that she failed to show that any difference in discipline between her and Godsey was pretext for race discrimination.

An adverse employment action requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Baxter Healthcare*, 533 F.3d at 402 (citation omitted). We have said that "a written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Cregett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012). The record shows that Presley was given a warning for mishandling a pill call, a one-day suspension without a loss of pay for her errors handling medical records, and was reassigned to an administrative position for improperly discontinuing an inmate's medication. Presley argues her reassignment separately, so her disparate discipline claim rests on the warning and one-day suspension. Though a suspension may be a materially adverse employment action even without a loss of pay, there is no indication that Presley's one-day suspension "had any long-term impact on the terms or conditions of [her] employment," as she was able to continue working and receiving her regular pay package even through the suspension. *Hill v. Nicholson*,

383 F. App'x 503, 509 (6th Cir. 2010); *see also Cregett*, 491 F. App'x at 566. The counseling and working suspension that Presley received as part of the progressive disciplinary system do not rise to the level of "a significant change in employment status," which the adverse employment action element requires. *Baxter Healthcare*, 533 F.3d at 402; *Hill*, 383 F. App'x at 509.

### 3.    Reassignment and Constructive Discharge

Presley also argues that ODRC discriminated against her by reassigning her to an administrative position pending investigation into a medical error, which she states constituted a constructive discharge. The district court held that Presley could not establish a prima facie case because she could not show that that the temporary reassignment was "objectively intolerable." On appeal, Presley argues that her assignments after transfer were significantly different from her assignments as a nurse on the hospital floor, and that such a reassignment, which she found humiliating, was unheard of at ToCI.

To show a constructive discharge where an employee's salary and benefits stay the same following reassignment, a plaintiff must provide evidence that the "employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and . . . the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). This analysis asks us to evaluate both the "employer's intent and the employee's objective feelings." *Id.* at 569. We assess seven factors in considering whether working conditions were objectively intolerable: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early

retirement or continued employment on terms less favorable than the employee's former status." *Id.* (citation omitted).

Presley contends that the district court failed to properly assess these factors, but does not offer an alternative evaluation that would support finding that her reassignment created objectively intolerable working conditions. Turning to the factors, Presley does not directly argue that the transfer was a demotion. Her assertions that the records position involved less responsibility and prestige might be taken as such; however, the evidence in the record shows that she was assigned to records only while she was under investigation for medical errors. Presley concedes that her salary was not reduced but did testify that the reassignment was humiliating, arguing that the "position of RN requires more training than a records clerk." This provides support for factors (3) and (4). The record is silent as to evidence supporting factors (5), (6), and (7). Considering the seven *Logan* factors, Presley fails to show sufficient support for her claim of objectively intolerable working conditions.

Presley also has not provided evidence that ODRC deliberately created these conditions with the intent of forcing her to quit. In *Logan*, we found that the evidence created an issue of fact because it was "completely foreseeable that a reasonable person would have resigned under the[] circumstances." 259 F.3d at 573; *see also Moore*, 171 F.3d at 1080 (finding that the defendant had intentionally isolated the plaintiff after he filed an EEOC complaint, which was sufficient evidence for a jury to conclude that the defendant intended for the plaintiff to resign). Temporarily reassigning Presley to work in records pending an investigation into a medical error did not create a situation where it was similarly foreseeable that a reasonable person would have resigned.

Thus, we affirm the district court's grant of summary judgment to ODRC on Presley's claim for race discrimination based on failure to promote, disparate discipline, and reassignment and constructive discharge.

**B.     Sex Discrimination Claim**

In addition to her race discrimination claim, Presley alleges that ODRC discriminated against her on the basis of her gender by punishing her more harshly than Mathews, a male nurse who was found sleeping on the job twice and written up once. The district court determined that Presley could not meet her prima facie case on this claim because Mathews did not engage in the "same conduct" and was not similarly situated.

To establish a comparator in a discrimination claim, we "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F.3d at 352. In the present case, Presley alleges that ODRC failed to punish Mathews as harshly as was called for under its Standards of Employee Conduct. Under the Standards, a first offense for sleeping on the job permits removal, and a second offense requires a fine, a five-day suspension or removal. Mathews's first offense was never placed in his disciplinary log, and his second offense was never punished despite a recommendation for discipline because the recommendation was delivered beyond the time requirements in the collective bargaining agreement. Presley generally asserts that ToCI was responsible for delaying the submission of the recommendation to punish Mathews. She contrasts this treatment with the write-ups and suspension she received, as well as her eventual reassignment, but fails to connect that evidence to her claim of sex discrimination.

Presley has not shown that Mathews was similarly situated in the relevant aspects. Simply showing that Mathews was caught engaging in discipline-worthy conduct during this time period at ToCI is not enough to make him an adequate comparator without demonstrating

-15-

how serious his misconduct was in comparison to Presley's. The record is unclear on this point, as the Standards do not specifically mention mishandling a pill call, improperly filing medical documentation, or mistakenly discontinuing medication, and Presley does not clarify how these offenses are covered by the Standards. Presley fails to establish a prima facie case of sex discrimination.

Even if she could meet this this first step, Presley cannot show that ODRC's legitimate, non-discriminatory reasons for disciplining her were pretext. Presley was given a write-up and working suspension for the errors she made handling patient medication and following proper institutional procedures. After Presley mistakenly discontinued an inmate's medication, ODRC temporarily reassigned her to an administrative position pending an investigation in the interest of patient safety. Presley has not provided evidence to show that these reasons "(1) ha[d] no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). While she disputes that some of these errors were in fact medical errors, these allegations are not sufficient to establish that ODRC's reasons for disciplining her had no basis in fact, especially in light of the pre-disciplinary conference she attended following the July 2013 incident and her interview with management following the 2014 incident. These assertions make clear that Presley's definition of "medical error" differs from ODRC's, but they do not support finding pretext where ODRC has pursued disciplinary actions in accordance with its definitions of medical errors. Thus, Presley's sex discrimination claim fails.

### III.    CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment to ODRC on all claims.