[Cite as *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Tony Moody, :

      Plaintiff-Appellant, : No. 21AP-159
(Ct. of Cl. No. 2019-01146JD)

v. :

Ohio Department of Mental Health and : (REGULAR CALENDAR)
Addiction Services,
                         :
      Defendant-Appellee.
                         :

D E C I S I O N

Rendered on December 28, 2021

**On brief:** *William J. O'Malley*, for appellant.
**Argued:** *William J. O'Malley*.

**On brief:** *Dave Yost,* Attorney General, *Gregory S. Young,*
and *Eric A. Walker,* for appellee. **Argued:** *Eric A. Walker*.

APPEAL from the Court of Claims of Ohio

SADLER, J.

{¶ 1} Plaintiff-appellant, Tony Moody, appeals from a judgment of the Court of Claims of Ohio granting summary judgment in favor of defendant-appellee, Ohio Department of Mental Health and Addiction Services ("ODMHAS"), on Moody's claims for race and national origin discrimination and retaliation. For the following reasons, we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Moody was born in Sierra Leone and immigrated to the United States in 2003, becoming a naturalized citizen in 2017. Beginning in 2013, Moody worked for ODMHAS as a Therapeutic Program Worker ("TPW") at Twin Valley Behavioral Healthcare

("Twin Valley") in Columbus, Ohio. Prior to his employment at Twin Valley, Moody worked as a State Tested Nursing Assistant ("STNA") at the Cleveland Clinic and a medical center in Louisiana, and as a TPW for the Ohio Department of Developmental Disabilities. Moody's first annual evaluation at Twin Valley, completed in mid-2014, reflected favorable ratings, indicating Moody met expectations in all relevant areas.

{¶ 3}   Moody was placed under the supervision of Tony LeMaster in 2015. That same year, Moody received formal workplace discipline three times. On April 6, 2015, Moody was verbally reprimanded for engaging in horseplay. Following that incident, LeMaster instructed Moody to read some provided materials and prepare a performance improvement action plan within one week. Moody failed to complete the assignment by the deadline and on May 5, 2015, he was given a written reprimand for failing to timely complete the performance improvement assignment. In September 2015, Moody was given a one-day working suspension for creating a disturbance in the workplace. On Moody's 2015 annual review, LeMaster indicated Moody met expectations in all areas except communication with his peers and supervisors and teamwork and communication. Moody believed the discipline he received in 2015 was because of his race and national origin, and because of a harassment claim he filed against a registered nurse at Twin Valley.

{¶ 4}   Moody transferred to a different supervisor; his annual reviews for 2017 and 2018 were favorable, indicating Moody met or exceeded expectations in all relevant areas. Moody did not receive formal workplace discipline again until 2018.

{¶ 5}   On June 21, 2018, Moody did not report to work despite being scheduled to work that day. When contacted by his supervisor, Moody explained he thought he was not scheduled to work that day based on an earlier version of the staff schedule. Moody ultimately reported for work more than two-and-one-half hours late. Based on ODMHAS's progressive discipline system, because there was prior discipline on his record, Moody was given a three-day working suspension in August 2018 for reporting late without authorization.[1]

---

[1] Moody disputes ODMHAS's claim that a three-day working suspension was the proper next step under the progressive discipline system. Moody asserts that, under the collective bargaining agreement in effect at the time of his one-day suspension, it should have been removed from his file after two years. The record belies Moody's claim, however. The notice of the one-day suspension, which was issued in September 2015, indicated it would remain in Moody's personnel file for 36 months. Additionally, the collective bargaining agreement in effect at the time of Moody's three-day working suspension in 2018 stated that records of

{¶ 6} Moody filed a discrimination charge based on the three-day working suspension with the Ohio Civil Rights Commission ("OCRC") and the United States Equal Employment Opportunity Commission ("EEOC") in September 2018 ("the OCRC/EEOC complaint"). After investigating, OCRC determined it was not probable ODMHAS had committed an unlawful discriminatory practice. The EEOC adopted the findings of OCRC's investigation.[2]

{¶ 7} In early December 2018, as part of an investigation of an unrelated incident, Moody alleged he recently had heard another TPW verbally abuse a patient. ODMHAS then investigated this allegation. The other TPW denied using an offensive term toward a patient and claimed he was addressing Moody at the time. The investigation of the other TPW was closed due to a lack of evidence to support Moody's claim. In late December 2018, there was a second investigation, related to Moody's claim that a different TPW harassed him by confronting him about patient care. During interviews as part of that investigation, Moody further claimed the TPW was rude and unprofessional to patients, hated a particular patient, and had yelled at and treated that patient unfavorably. Ultimately, the investigator concluded Moody's claims were unsubstantiated. The investigator found that Moody "by his own admission, indicated numerous allegations that he claims to have noted involving abuse, neglect, or mistreatment of patients without having ever documented an Incident Report for any such allegations." (Def. Ex. A-9, TVBH Police Investigation Report Case No. 507-12-18.) For clarity, we will refer to these two investigations collectively as the "December 2018 investigations."

{¶ 8} In January 2019, Moody was notified that because of the December 2018 investigations he was being charged with failure to immediately report a violation of a work rule, policy, or procedure. A pre-disciplinary meeting resulted in a finding that there was just cause to discipline Moody. Because Moody's prior discipline had been a three-day working suspension, under ODMHAS's progressive discipline system the next step would range from a five-day working suspension to termination. Moody resigned in April 2019 before ODMHAS imposed any discipline on the failure to report charge. At the time of his

---

disciplinary action, other than written reprimands, issued after July 1, 2015 would remain in an employee's file for 36 months. Moody has not presented evidence of any contradictory terms in an earlier collective bargaining agreement. Thus, the record before us indicates the one-day working suspension was still properly part of Moody's disciplinary record when the three-day working suspension was imposed in August 2018.

[2] The EEOC issued a "right to sue" letter to Moody in October 2019.

resignation, Moody had accepted a position as an STNA at the Ohio State University Medical Center.

{¶ 9}   Moody filed a complaint in the Court of Claims asserting claims under federal and state law for race and national origin discrimination, and under state law for retaliation. He claimed that "[t]hroughout his employment [at Twin Valley], [he] was treated worse than his white, native-born co-workers, and even worse than his non-white but native-born co-workers." (Compl. at ¶ 5.)  Moody alleged the three-day working suspension imposed in August 2018 was unreasonable and that his white and native-born, non-white coworkers frequently received no discipline for tardiness.  Moody further alleged the December 2018 investigations were retaliation for filing the OCRC/EEOC complaint.

{¶ 10}  ODMHAS moved for summary judgment, asserting Moody had not suffered an adverse employment action because the working suspensions did not involve loss of or reduction in pay or loss of seniority.  ODMHAS also argued there were legitimate non-discriminatory reasons to discipline Moody for each incident and that it followed its progressive discipline system in imposing discipline.  Moody opposed the motion for summary judgment, asserting the three-day working suspension was an adverse employment action because other employees received informal discipline for similar infractions.  Moody further asserted the December 2018 investigations were an adverse employment action because they were unwarranted and, under the progressive discipline system, would have resulted in a five-day suspension or termination.  Moody claimed ODMHAS's proffered reasons for discipline were pretext and alleged the discipline was based on race and national origin discrimination and retaliation.

{¶ 11} The Court of Claims granted ODMHAS's motion for summary judgment, concluding Moody failed to establish he suffered an adverse employment action for purposes of his discrimination claims.  The court further concluded Moody also failed to demonstrate the disciplinary actions were a pretext for race or national origin discrimination.  Regarding Moody's retaliation claim, the Court of Claims concluded Moody failed to establish the December 2018 investigations were a pretext for retaliation. Moody timely appealed the court's decision.

## II.  ASSIGNMENTS OF ERROR

{¶ 12}  Moody assigns the following two assignments of error:

1. The Court of Claims erred when it granted Summary Judgment to Defendant Ohio Department of Mental Health and Addiction Services on Plaintiff-Appellant's claim of race and national origin discrimination.

2. The Court of Claims erred when it granted Summary Judgment to Defendant Ohio Department of Mental Health and Addiction Services on Plaintiff-Appellant's claim of retaliation.

## III. STANDARD OF REVIEW

{¶ 13} Under Civ.R. 56(C), summary judgment is appropriate when the moving party demonstrates: "(1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is averse to the party against whom the motion for summary judgment is made." *Capella III, LLC v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.). "When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims." *Lundeen v. Graff*, 10th Dist. No. 15AP-32, 2015-Ohio-4462, ¶ 11. If the moving party meets its burden, the non-moving party must set forth specific facts establishing a genuine issue for trial. *Id.*

{¶ 14} "Appellate review of a trial court's ruling on a motion for summary judgment is de novo." *You v. Northeast Ohio Med. Univ.*, 10th Dist. No. 19AP-733, 2020-Ohio-4661, ¶ 12. We conduct an independent review without deference to the trial court's decision. *Id.* "In reviewing a motion for summary judgment, we must construe all evidence in a light in favor to the non-moving party." *Id.* at ¶ 13.

## IV. LEGAL ANALYSIS

### A. Moody's race and national origin discrimination claims

{¶ 15} Moody's first assignment of error asserts the Court of Claims erred by granting summary judgment on his claims for race and national origin discrimination. Under Ohio law, it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, * * * national origin, * * * or ancestry of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A).

Similarly, under federal law it is "an unlawful employment practice for an employer * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(1).  Generally, employment discrimination claims under R.C. 4112.02(A) are interpreted in accordance with case law interpreting the analogous federal provision.[3]  *Tanksley v. Howell*, 10th Dist. No. 19AP-504, 2020-Ohio-4278, ¶ 20. Accordingly, we will address Moody's state and federal employment discrimination claims together.

### 1. The *McDonnell Douglas* burden-shifting framework for establishing discrimination through indirect evidence

{¶ 16}  A plaintiff must prove discriminatory intent to prevail on a race or national origin discrimination claim.  *Kenner v. Grant/Riverside Med. Care Found.*, 10th Dist. No. 15AP-982, 2017-Ohio-1349, ¶ 26.  Absent direct evidence, a plaintiff may establish discriminatory intent through indirect evidence under the three-step, burden-shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which was adopted by the Supreme Court of Ohio in *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192 (1981).[4]  *Kenner* at ¶ 26.

{¶ 17} The first step of the *McDonnell Douglas* framework requires a plaintiff to establish a prima facie case of discrimination.  *Id.* at ¶ 27.  "In order to establish a prima facie case, a plaintiff must demonstrate that he or she:  (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position in question, and (4) was replaced by someone outside of the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Tanksley* at ¶ 22. "Establishing a prima facie case 'creates a presumption that the employer unlawfully discriminated against the employee.' "  *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 11, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

---

[3] Notwithstanding this general principle, we note the Supreme Court of Ohio has held we are not bound to apply federal decisions interpreting federal statutes when evaluating analogous Ohio statutes.  *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 31.

[4] The *McDonnell Douglas* burden-shifting framework was subsequently modified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008).  Accordingly, we have sometimes referred to it as the "*McDonnell Douglas/Burdine*" framework.  *See, e.g., Leslie v. Ohio Dept. of Dev.*, 171 Ohio App.3d 55, 2007-Ohio-1170, ¶ 47 (10th Dist.).

{¶ 18} If a plaintiff establishes a prima facie case of discrimination, the second step of the *McDonnell Douglas* framework shifts the burden to the employer "to rebut the presumption of discrimination by presenting evidence of some legitimate, nondiscriminatory reason for its action." *Kenner* at ¶ 28. This is a burden of production, not persuasion, and is satisfied if the employer " 'introduce[s] evidence which *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.' " (Emphasis sic.) *Id.*, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "If the employer articulates a legitimate, nondiscriminatory reason, 'the presumption created by the prima facie case drops from the case because the employer's evidence has rebutted the presumption of discrimination.' " *Id.*, quoting *Williams* at ¶ 12. "However, if the employer fails to meet its burden of production and 'reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case,' then the question of whether the employer discriminated must be decided by the fact finder." (Emphasis sic.) *Williams* at ¶ 13, quoting *St. Mary's* at 509-10.

{¶ 19} If the employer carries its burden of demonstrating a legitimate, nondiscriminatory reason, the third step of the *McDonnell Douglas* framework shifts the burden back to the plaintiff to "demonstrate, by a preponderance of the evidence, that the reason the employer offered for taking the adverse employment action is actually a pretext for discrimination." *Kenner* at ¶ 29. "A plaintiff may establish that the employer's proffered reason for the adverse employment action is a pretext for discrimination by demonstrating that the stated reason had no basis in fact, the reason offered was not the actual reason for the employment action, or that the reason offered was insufficient to explain the employer's action." *Tanksley* at ¶ 23. "Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him." *Knepper v. Ohio State Univ.*, 10th Dist. No. 10AP-1155, 2011-Ohio-6054, ¶ 12. At this step, the plaintiff's burden merges with the ultimate burden of persuasion and he must show " 'both that the [employer's] reason was false, *and* that discrimination was the real reason.' " (Emphasis sic.) *Kenner* at ¶ 30, quoting *St. Mary's* at 515.

## 2. Application of *McDonnell Douglas* framework to Moody's race and national origin discrimination claims

{¶ 20} Moody has not presented direct evidence of discrimination; because he relies on indirect evidence, we will analyze his claims under the *McDonnell Douglas* framework. For his claims to proceed, Moody must first establish a prima facie case of race and national origin discrimination by establishing he: "(1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position in question, and (4) was replaced by someone outside of the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Tanksley* at ¶ 22. On appeal, Moody points to three potentially discriminatory disciplinary actions: (1) the discipline imposed in 2015, (2) the three-day suspension imposed in August 2018, and (3) the December 2018 investigations. We will consider whether Moody established a prima facie case of discrimination as to each of these alleged incidents. *See Campbell v. Univ. of Akron*, 211 F.Appx. 333, 341-50 (6th Cir.2006) (separately analyzing whether the appellant established a prima facie case as to each form of allegedly discriminatory discipline).

### a. Membership in protected class and qualifications for position

{¶ 21} It is undisputed that Moody is a member of a protected class and was qualified for the TPW position. Moody is black and is a native of Sierra Leone, although he is now a naturalized United States citizen. Prior to working at Twin Valley, Moody previously worked as an STNA at the Cleveland Clinic and a medical center in Louisiana; he also worked as a TPW for the Ohio Department of Developmental Disabilities.

### b. Treatment of similarly situated non-protected employees

{¶ 22} Moody must demonstrate ODMHAS treated similarly situated non-protected employees more favorably with respect to the allegedly discriminatory actions. When determining whether an employer treated similarly situated, non-protected individuals more favorably, "the individual[s] with whom the plaintiff seeks to compare [his] treatment must be similar in all relevant respects." *Kenner* at ¶ 33. Courts consider whether those individuals "dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

{¶ 23} The discipline imposed in 2015 consisted of a verbal reprimand for engaging in horseplay, a written reprimand for neglect of duty for failing to complete the

performance improvement plan as assigned, and a one-day working suspension for creating a disturbance. Moody averred the other employees involved in the horseplay and "creating a disturbance" incidents were not disciplined. He also generally asserted that he "observed that at Twin Valley white people were treated better than black people and both black and white people born in the United States were treated better than those born in Africa." (Moody Aff. at ¶ 20, Pl.'s Ex. 1.) Beyond Moody's bare assertions, however, there is no evidence in the record that ODMHAS treated similarly situated non-protected employees more favorably when they committed the types of infractions he was accused of in 2015.

{¶ 24} Regarding the three-day suspension imposed in August 2018, Moody claimed that "tardiness, even of several hours, normally resulted in the employee receiving an informal warning from a supervisor and occasionally an entry in the Supervisory Log, rather than formal discipline under the Discipline Grid." (Moody Aff. at ¶ 7, Pl.'s Ex. 1.) In support of this assertion, Moody submitted records from 2018 establishing that several other employees received non-disciplinary "supervisory log counseling" after reporting to work late, including instances of being late multiple times in the same pay period. One of the supervisory log entries involved a TPW who claimed he did not know he was scheduled to work that day and another involved a TPW who was late because she misread the schedule; both of which were like Moody's explanation for being late. Moody averred all the individuals who received supervisory log counseling were "either non-black or were born in the United States." (Moody Aff. at ¶ 8, Pl.'s Ex. 1.) Moody also submitted an affidavit from a former TPW at Twin Valley who stated she frequently worked with Moody and was occasionally late to work but never received formal discipline for being late. Construing this evidence most favorably to Moody, it demonstrates ODMHAS treated similarly situated, non-protected individuals more favorably because they were not subjected to formal discipline for arriving late to work.

{¶ 25} The December 2018 investigations were based on Moody's failure to file incident reports about alleged infractions by his coworkers. Moody alleges ODMHAS only became aware he had not filed incident reports against others after two coworkers filed incident reports about him. Moody has not presented any evidence regarding how ODMHAS treated any other employee accused of not filing incident reports. Accordingly,

Moody has not demonstrated that ODMHAS treated similarly situated non-protected employees more favorably with respect to the December 2018 investigations.

{¶ 26} Because Moody has only established that ODMHAS treated similarly situated non-protected employees more favorably regarding discipline imposed for reporting to work late, Moody fails to demonstrate a prima facie case of discrimination based on the discipline imposed in 2015 or the December 2018 investigations. Our analysis of the remaining element of a prima facie case will proceed only with respect to the three-day working suspension imposed on Moody in August 2018.

### c. Adverse employment action

{¶ 27} Having established that ODMHAS treated similarly situated non-protected employees more favorably when they reported to work late, Moody must also establish that the three-day working suspension imposed in August 2018 was an adverse employment action. "[A]n adverse employment action 'is a materially adverse change in the terms and conditions of the plaintiff's employment.' " *Paranthaman v. State Auto Prop. & Cas. Ins. Co.*, 10th Dist. No. 14AP-221, 2014-Ohio-4948, ¶ 34, quoting *Canady v. Rekau & Rekau, Inc.*, 10th Dist. No. 09AP-32, 2009-Ohio-4974, ¶ 25. Whether a particular action constitutes an adverse employment action is determined on a case-by-case basis. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, ¶ 38 (10th Dist.). "Factors to consider in determining whether an employment action was materially adverse include termination, demotion evidenced by a decrease in salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation." *Dautartas v. Abbott Labs.*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 52. By contrast, " 'actions that result in mere inconvenience or an alteration of job responsibilities are not disruptive enough to constitute adverse employment actions.' " *Id.*, quoting *Canady* at ¶ 25.

{¶ 28} Applying these principles, we have previously found that termination of employment generally constitutes an adverse employment action. *Paranthaman* at ¶ 43. Similarly, failure to renew an employment contract is an adverse employment action. *Samadder* at ¶ 39. Federal courts have held that an unpaid suspension may constitute an adverse employment action. *See Rose v. Buckeye Telesystem, Inc.*, 181 F.Supp.2d 772, 777 (N.D.Ohio 2001). By contrast, the Sixth Circuit has held that a paid suspension generally does not constitute an adverse employment action. *Sensabaugh v. Halliburton*, 937 F.3d

621, 629 (6th Cir.2019) ("Several panels of this court have determined that a suspension with pay does not constitute an adverse action."). *But see Presley v. Ohio Dept. of Rehab. & Corr.*, 675 F.Appx. 507, 514 (6th Cir.2017) ("[A] suspension may be a materially adverse employment action even without a loss of pay.").

{¶ 29} The Sixth Circuit has held that a 40-hour suspension[5] and transfer to a different position constituted adverse employment actions for purposes of a discrimination claim. *Arnold v. Columbus*, 515 F.Appx. 524, 532 (6th Cir.2013). The *Arnold* case involved multiple discrimination claims by members of the Columbus Division of Fire. *Id.* at 527. In relevant part, the court concluded that although the named plaintiff retained the same title and salary following her transfer, she had "significantly diminished material responsibilities," including working on administrative duties, no longer managing a large staff, and no longer having a city-provided vehicle. *Id.* at 532.

{¶ 30} By contrast, in *Presley*, the Sixth Circuit concluded a former nurse for the Department of Rehabilitation and Corrections was not subjected to adverse employment actions when she was given disciplinary counseling for mishandling a pill call and a one-day paid working suspension for making medication errors. *Presley* at 514-15. The nurse filed race and sex discrimination claims, alleging disparate discipline, improper reassignment, and constructive discharge, and asserting white nurses were not given similar discipline for the same infractions. *Id.* at 508. While acknowledging a suspension could be a materially adverse employment action, the court found "there [was] no indication that [the plaintiff's] one-day suspension 'had any long-term impact on the terms or conditions of [her] employment,' as she was able to continue working and receiving her regular pay package even through the suspension." *Id.* at 514, quoting *Hill v. Nicholson*, 383 F.Appx. 503, 509 (6th Cir.2010). The court concluded the disciplinary counseling and working suspension were part of the employer's progressive disciplinary system and did not constitute a significant change in the plaintiff's employment status. *Id.*; *see also Rose* at 777 (holding that a one-day suspension with pay did not constitute an adverse employment action and plaintiff failed to establish that other discipline materially affected employment).

---

[5] We note the decision in *Arnold v. Columbus*, 515 F.Appx. 524, 532 (6th Cir.2013) is not clear whether the suspension was with or without pay. *See Arnold* at 528 (referring to fire chief's recommendation of 80-hour suspension for employee, which was reduced by the Civil Service Commission to 40 hours).

{¶ 31} Moody argues the three-day working suspension was an adverse employment action because it escalated his position in the progressive discipline system and meant any future infraction would be subject to a five-day suspension or termination. We have held that where an employer is not required to use progressive discipline prior to terminating an employee, the failure to use progressive discipline does not necessarily establish a pretext for discrimination. *Crase v. Shasta Bevs., Inc.*, 10th Dist. No. 11AP-519, 2012-Ohio-326, ¶ 19; *Wigglesworth v. Mettler Toledo Intl., Inc.*, 10th Dist. No. 09AP-411, 2010-Ohio-1019, ¶ 24-25. Conversely, in this case, ODMHAS's application of its progressive discipline system when disciplining Moody for being late to work does not, in itself, constitute an adverse employment action.[6] *See Davis v. Cleveland*, 8th Dist. No. 83665, 2004-Ohio-6621, ¶ 11, quoting *Rose* at 776-77, quoting *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir.2000) ("The anti-discrimination statues, however, do not insulate an employee from discipline for 'violating the employer's rules or disrupting the workplace.' ").

{¶ 32} In this case, Moody did not lose pay during the three-day working suspension. Moreover, his hourly wage and seniority were not affected by the three-day working suspension. Unlike the plaintiff in *Arnold*, Moody has not demonstrated any "diminished material responsibilities" resulting from the suspension. *Arnold.* at 532. Thus, like the plaintiff in *Presley*, Moody has failed to demonstrate the three-day working suspension had any long-term impact on the terms or conditions of his employment. *See Presley* at 514. Even construing the evidence most favorably to Moody, we conclude he fails to demonstrate the three-day working suspension imposed in August 2018 was an adverse employment action purposes of his race and national origin discrimination claims. Therefore, Moody has failed to establish a prima facie case of race and national origin discrimination.

---

[6] We note the federal district court decision in the *Presley* case, which was affirmed by the Sixth Circuit, rejected the plaintiff's claim that her employer's written reprimands "carr[ied] extra weight because it use[d] a progressive discipline policy." *Presley v. Ohio Dept. of Rehab. & Corr.*, N.D. Ohio No. 3:15-CV-67 (Apr. 27, 2016). The court concluded "Presley's proposed rule—that any reprimand issued as part of a progressive discipline policy is itself a materially adverse employment action—would gut the adverse-action element of any meaning." *Id.* In the present case, Moody's argument suggests a similar rule, effectively resulting in any application of progressive discipline necessarily being an adverse employment action if it moved an employee farther along in the progressive system and potentially subjected him to greater future discipline.

### 3. Conclusion regarding Moody's race and national origin discrimination claims

{¶ 33} Because Moody failed to establish a prima facie case of race or national origin discrimination, we need not consider the second or third steps of the *McDonnell Douglas* analytical framework. *Dautartas* at ¶ 42. The Court of Claims properly concluded Moody had not established an adverse employment action and, therefore, did not err by granting summary judgment to ODMHAS on Moody's race and national origin discrimination claims.

{¶ 34} Accordingly, we overrule Moody's first assignment of error.

## B. Moody's retaliation claim

{¶ 35} Moody's second assignment of error asserts the Court of Claims erred by granting summary judgment for ODMHAS on his retaliation claim. Under Ohio law, it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in [R.C. 4112.02] or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." R.C. 4112.02(I). Because of the similarities between R.C. 4112.02(I) and Title VII of the Civil Rights Act of 1964, Ohio courts look to federal case law for assistance in interpreting retaliation claims under R.C. 4112.02(I). *Grubach v. Univ. of Akron*, 10th Dist. No. 19AP-283, 2020-Ohio-3467, ¶ 67.

### 1. The *McDonnell Douglas* burden-shifting framework for establishing retaliation through indirect evidence

{¶ 36} Moody claims the December 2018 investigations were retaliation for filing the OCRC/EEOC complaint. He does not present any direct evidence that the investigations were retaliatory; therefore, he must rely on indirect evidence. Like discrimination claims, retaliation claims based on indirect evidence are evaluated under the three-step *McDonnell Douglas* analytical framework. *Wu v. Northeast Ohio Med. Univ.*, 10th Dist. No. 18AP-656, 2019-Ohio-2530, ¶ 29. A plaintiff must establish a prima facie case of retaliation by demonstrating "(1) the plaintiff engaged in a protected activity, (2) the employer knew the plaintiff engaged in the protected activity, (3) the employer subjected the plaintiff to an adverse employment action, and (4) a causal link existed between the protected activity and the adverse action." *Id.* If the plaintiff demonstrates a prima facie case, the burden shifts to the employer to articulate a legitimate reason for its

action.  *Id.*  If the employer meets that burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason was a pretext for retaliation.  *Id.*

### 2. Application of *McDonnell Douglas* framework to Moody's retaliation claim

#### a. Engaging in protected activity and ODMHAS's knowledge of protected activity

{¶ 37}  Moody asserts he filed the OCRC/EEOC complaint in September 2018, after the three-day working suspension was imposed.  Filing a complaint with the OCRC or EEOC is a protected activity under R.C. 4112.02(I).  *Martcheva v. Dayton Bd. of Edn.*, 2d Dist. No. 29144, 2021-Ohio-3524, ¶ 40 ("In this case, the trial court found, and we agree, that Martcheva had engaged in a protected activity—she filed two complaints with the Ohio Civil Rights Commission (OCRC)."); *Paranthaman* at ¶ 53 (referring to employee's internal complaints and EEOC claims as protected activity); *Townsend v. Rockwell Automation, Inc.*, 852 F.Appx. 1011, 1016 (6th Cir.2021) ("Protected activities include filing an EEOC charge and opposing discriminatory practices by making complaints to management."). The record does not indicate when ODMHAS became aware of the OCRC/EEOC complaint, but federal law provides the EEOC must give notice of a charge to an employer within ten days.  42 U.S.C. 2000e-5(b); *Edelman v. Lynchburg College*, 535 U.S. 106, 119 (2002). Construing the evidence most favorably to Moody, it appears ODMHAS would have had notice of the OCRC/EEOC complaint by October 2018.  *See Hartman v. Ohio Dept. of Transp.*, 10th Dist. No. 16AP-222, 2016-Ohio-5208, ¶ 32 ("It is not clear from the record when Ohio Department of Transportation learned of the EEOC charge, but in the normal course of affairs it should have received notice as a matter of statute.").  ODMHAS has not claimed it lacked knowledge of the OCRC/EEOC complaint.  Therefore, Moody has demonstrated that ODMHAS knew of his protected activity before the December 2018 investigations.

#### b. Adverse employment action

{¶ 38}  In the context of a retaliation claim, a plaintiff must show an alleged adverse employment action "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Smith v. Superior Prod., LLC*, 10th Dist. No. 13AP-690, 2014-Ohio-1961, ¶ 34; *see also Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 13, fn. 2 (noting that under R.C. 4112.02(I) "the adverse action need not be employment-related, so the filing of a lawsuit or a counterclaim can constitute an adverse

employment action in circumstances such as those in this case"); *Arnold* at 536-37, quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("Demonstrating the third prima facie element in a Title VII retaliation case, an adverse employment action, is less onerous than in the discrimination context in that it 'is not limited to discriminatory actions that affect the terms and conditions of employment.' ").

{¶ 39} We have held that denial of consideration for promotion, exclusion from meetings, and being singled out for discipline were sufficient to demonstrate adverse employment action for a retaliation claim. *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 728 (10th Dist.1999). The Sixth Circuit has held that an investigation of alleged research misconduct by a university professor could constitute an adverse employment action for purposes of a Title VII retaliation claim. *Szeinbach v. Ohio State Univ.*, 493 F.Appx. 690, 695-96 (6th Cir.2012). Similarly, the Sixth Circuit has noted that internal investigations, loss of remote parking privileges, a requirement to complete time sheets, and a suspension and transfer could constitute adverse employment actions to demonstrate a prima facie case of retaliation. *Arnold* at 537.

{¶ 40} Moody claims the December 2018 investigations were an adverse employment action for purposes of his retaliation claim. During the investigations, Moody was subjected to multiple police interviews. Based on the December 2018 investigations, Moody was charged with failing to report violations and, after a pre-disciplinary meeting, a human relations officer found there was just cause to discipline Moody. Under ODMHAS's progressive discipline system, Moody potentially faced a five-day working suspension or termination. Construing this evidence most favorably to Moody, an investigation and potential discipline could have a chilling effect on an employee's willingness to oppose workplace discipline and "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Superior Prod.* at ¶ 34. Therefore, Moody has demonstrated that he was subjected to an adverse employment action for purposes of his retaliation claim.

### c. Causation

{¶ 41} Finally, to establish a prima facie case of retaliation, Moody must demonstrate a causal link between his filing of the OCRC/EEOC complaint and the December 2018 investigations. Moody has not presented direct evidence of a causal connection and must rely on circumstantial evidence. We have held that "close temporal

proximity between the employer's knowledge of the protected activity and the adverse employment action may constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation." *Dautartas* at ¶ 54. Although we have noted that proximity alone does not necessarily imply causation, we have held that an adverse employment action occurring two months after a protected activity was sufficient to establish a prima facie case of retaliation. *Hartman* at ¶ 32. Similarly, the Sixth Circuit has held that a gap of three months between an employer learning of a protected activity and an adverse employment action may permit inference of a causal connection. *Id.* at ¶ 31, citing *Haji v. Columbus City Schools*, 621 F.Appx. 309, 313 (6th Cir.2015). As noted above, in this case the record does not establish exactly when ODMHAS learned of the OCRC/EEOC complaint, but it should have been advised of the EEOC complaint by October 2018. The December 2018 investigations began in early December 2018, little more than two months later. Thus, consistent with our decision in *Hartman* and construing the evidence most favorably to Moody, the approximately two-month gap between the protected activity and the adverse employment action in this case would permit a finding of causation.

{¶ 42} Construing the evidence most favorably to Moody, we conclude he demonstrated each of the elements of a prima facie case of retaliation.

### d. Legitimate reason for ODMHAS's action

{¶ 43} Because Moody established a prima facie case of retaliation, under the *McDonnell Douglas* framework, the burden shifts to ODMHAS to demonstrate a legitimate reason for its action. This burden is satisfied if an employer " 'introduce[s] evidence which *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.' " (Emphasis sic.) *Kenner* at ¶ 28, quoting *Hicks* at 509. ODMHAS asserts Moody's failure to file incident reports about alleged misconduct by his coworkers was discovered when Moody was interviewed about an unrelated matter. ODMHAS alleges the December 2018 investigations were necessary because failing to file incident reports would violate its reporting policies. ODMHAS claims all discipline imposed on Moody was consistent with its progressive discipline system and suggests any discipline arising from the December 2018 investigations would have followed that system. Taken as true, ODMHAS's claim that Moody violated its incident reporting policies would permit a conclusion that ODMHAS had a legitimate, non-retaliatory reason for undertaking the

December 2018 investigations. Therefore, ODMHAS met its burden under the second step of the *McDonnell Douglas* framework.

### e. Pretext for retaliation

{¶ 44} Under the third step of the *McDonnell Douglas* framework, because ODMHAS presented a legitimate justification for the December 2018 investigation, the burden shifts back to Moody to establish that ODMHAS's explanation was a pretext for retaliation. *Dautartas* at ¶ 49. "In order to prevail on a claim of retaliation where the employer has articulated a legitimate, nondiscriminatory reason, the plaintiff must prove not only that the proffered reason was a pretext, but also that the real reason for the employer's action was unlawful retaliation." *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 76. "A plaintiff may establish pretext by proving that: (1) the employer's stated reason for [the action] has no basis in fact, (2) the reason offered was not the actual reason for the [action], or (3) the reason offered was insufficient to explain the employer's action." *Id.* at ¶ 77.

{¶ 45} Moody effectively argues ODMHAS's proffered reason was insufficient to explain the December 2018 investigations. He asserts TPWs at Twin Valley had some discretion regarding when to file incident reports because not every infraction merited a formal incident report. Moody claims incident reports were an elevated form of reporting that automatically triggered a police investigation, whereas reporting matters to the charge nurse allowed them to be resolved informally. Moody asserted he "generally reported workplace problems to the Charge Nurse, rather than automatically escalate all issues into Incident Reports and police investigations" and that he "only filed Incident Reports for the most egregious conduct." (Moody Aff. at ¶ 10, Pl.'s Ex. 1.) Moody further claimed this "was the way most such incidents were handled by my fellow TPWs." (Moody Aff. at ¶ 10, Pl.'s Ex. 1.) In addition to his personal understanding of appropriate reporting practices, Moody cites a statement made by a registered nurse during the December 2018 investigations. The nurse told the investigator that if a TPW witnessed a patient violation she would advise the TPW to tell the registered nurse on duty about it. Construing this evidence most favorably to Moody, it creates a genuine issue of material fact regarding the incident reporting practices at Twin Valley and, by extension, whether ODMHAS's justification for the December 2018 investigation (i.e., that it was necessary because Moody violated policy by failing to report workplace incidents) was merely a pretext for retaliation.

### 3. Conclusion regarding Moody's retaliation claim

{¶ 46} Construing the evidence most favorably to Moody as the non-moving party, as we must in a summary judgment motion, we conclude Moody demonstrated a prima facie case that the December 2018 investigations were retaliation for filing the OCRC/EEOC complaint. ODMHAS met its burden of presenting a legitimate, non-retaliatory reason for its action, asserting Moody failed to comply with its incident reporting policies. The burden then shifted back to Moody and he demonstrated a genuine issue of material fact as to whether ODMHAS's proffered explanation was merely a pretext for retaliation. Therefore, the Court of Claims erred by granting summary judgment for ODMHAS on Moody's retaliation claim.

{¶ 47} Accordingly, we sustain Moody's second assignment of error.

## V. CONCLUSION

{¶ 48} For the foregoing reasons, we overrule Moody's first assignment of error and sustain his second assignment of error. We affirm the Court of Claims' grant of summary judgment in favor of ODMHAS on Moody's race and national origin discrimination claims but reverse the grant of summary judgment in favor of ODMHAS on Moody's retaliation claim. We remand this matter to the Court of Claims for further proceedings consistent with law and this decision.

*Judgment affirmed in part*
*and reversed in part.*

JAMISON and NELSON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____